In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3561

BREWSTER MCCAULEY, as Special Administrator
of the Estate of Mersaides McCauley,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 2604—**Amy J. St. Eve**, *Judge.*

ARGUED SEPTEMBER 15, 2010—DECIDED OCTOBER 20, 2011

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Mersaides McCauley was shot
and killed by her ex-boyfriend Glenford Martinez as she
left the parking lot of her church in Chicago. Martinez
then turned the gun on himself. At the time of the murder-
suicide, Martinez was on parole for an earlier homicide
and had a history of harassing and assaulting McCauley

in violation of his parole and a court order of protection issued on her behalf. Chicago law-enforcement and Illinois corrections officials were aware of these violations and could have ensured that Martinez was detained without bail, but they neither issued a parole-violation warrant nor arrested him for violating the order of protection.

After Mersaides's death, her father, Brewster McCauley, as administrator of her estate, filed suit in state court against the City of Chicago and several of its officials, the Illinois Department of Corrections ("IDOC") and its director, and Martinez's estate. The complaint alleged 13 separate federal and state claims for relief; those relevant here are equal-protection claims against the City of Chicago and the IDOC director.

The city and state defendants removed the case to federal court and promptly moved to dismiss. The district court granted the motion. The court held that female victims of domestic violence are not a "suspect" or "protected" class for purposes of equal-protection analysis, so McCauley's equal-protection claim against the City failed as a matter of law. The court also held that McCauley's claim against the IDOC director was barred by the Eleventh Amendment because the claim sought damages from the director in his official capacity. McCauley asked for leave to conduct limited discovery in the hope of finding a basis for a personal-capacity equal-protection claim against the IDOC director. The district court denied this request. McCauley appealed.

We affirm, although on different grounds. The complaint does not plausibly state a policy-or-practice equal-

protection claim against the City. It contains only general-ized allegations that the City failed to have specific policies in effect to protect victims of domestic violence from harm inflicted by those who violate their parole or court orders of protection by committing acts of domes-tic violence. The complaint alleges, in essence, that the City failed to single out domestic-violence victims as a class for *special* protection, not that the City denied this class of victims *equal* protection.

McCauley does not contest the dismissal of his equal-protection claim against the IDOC director in his official capacity, but he does seek review of the court's denial of his request for limited discovery for the purpose of finding a basis for a personal-capacity claim. At oral argument, however, McCauley's counsel admitted he had no reason to believe the IDOC director had any personal involvement in supervising Martinez's parole, let alone any of the events leading to Mersaides's death. Accordingly, the district court properly denied the request for Rule 12(b)(6) discovery.

## I. Background

In 1993 Martinez was convicted of murder and attempted murder and sentenced to 28 years in prison. He was released in 2006 and placed on mandatory super-vised release for three years. In November 2007 Martinez was arrested and charged with domestic battery for allegedly choking Mersaides McCauley, his former girl-friend, until she lost consciousness. Two days later an Illinois state court entered an emergency order of pro-

tection against Martinez on behalf of Mersaides. Later that month the court issued a plenary order of protection. Both orders prohibited Martinez from having any contact with Mersaides.

On two separate occasions, the Cook County State's Attorney's Office informed Martinez's parole officer at IDOC of the battery charge and arrest. The arrest was a parole violation and subjected Martinez to immediate detention without bail until his trial on the domestic-battery charge. Despite having received this information, no one at IDOC ever issued a parole-violation warrant against Martinez. After his release on bail, Martinez continued to contact Mersaides, repeatedly violating the orders of protection. The complaint alleges that Chicago police were aware of these violations but never arrested Martinez.

That Martinez remained a free man ended tragically for Mersaides. As she was leaving a church service on the evening of April 6, 2008, Martinez blocked her vehicle with his own, trapping her in the church parking lot. He shot her multiple times, and she died of the gunshot wounds 30 minutes later. After leaving the scene, Martinez turned the gun on himself and committed suicide.

Mersaides's father, Brewster McCauley, filed this suit as special administrator of his daughter's estate. The complaint alleged 13 federal and state claims (primarily for deprivation of due process and equal protection, and for wrongful death) against the City of Chicago and unidentified Chicago police officers, IDOC, various IDOC

officials, then-IDOC Director Roger Walker, and Martinez's estate. The city and state defendants removed the case to federal court and moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the motion, dismissed the federal claims, and declined to exercise supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.,* 551 F.3d 599, 607 (7th Cir. 2008).

Only the equal-protection claims against the City and Walker are at issue on appeal. The claim against the City was a policy-or-practice claim under *Monell v. Department of Social Services,* 436 U.S. 658, 694 (1978). The complaint variously alleges that the City failed to have adequate policies in place for the protection of female victims of domestic violence. The court began its analysis of this claim by rejecting McCauley's contention that female victims of domestic violence are a "suspect class" for equal-protection purposes. The judge opted for rational-basis review and then concluded that to avoid dismissal, McCauley needed to show that Mersaides was a member of a protected class. Noting that "protected class" and "suspect class" mean the same thing in equal-protection doctrine, the judge held that McCauley could not establish a necessary prerequisite for a claim under the Equal Protection Clause; that is, because Mersaides did not belong to a suspect class, she did not belong to a protected class either. That meant, the court held, that McCauley could not satisfy the first requirement of a prima facie case of discrimination under the Equal Protection Clause. Finally, the court held that the

complaint failed to state a "class of one" equal-protection claim against the City.

As for the claim against IDOC Director Walker, the district court held that the Eleventh Amendment's sovereign-immunity protections barred McCauley from recovering damages against him in his official capacity. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *Peirick v. IUPUI Athletics Dep't,* 510 F.3d 681, 695 (7th Cir. 2007); *Joseph v. Bd. of Regents of the Univ. of Wis. Sys.,* 432 F.3d 746, 748 (7th Cir. 2005). McCauley asked the court for a limited opportunity to conduct discovery in an effort to find a factual basis for a personal-capacity claim against Walker. The court denied this request, essentially holding that it would be futile. Because McCauley's equal-protection claim against the City failed as a matter of law, the court thought any similar claim against Walker in his personal capacity would fail as well.

## II.  Discussion

### A.  McCauley's Equal-Protection Claim Against the City

We review de novo the district court's order dismissing the equal-protection claim against the City. *Brooks v. Ross,* 578 F.3d 574, 578 (7th Cir. 2009). To avoid dismissal, McCauley's complaint must contain allegations that "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

We note first that the district court's analysis of McCauley's claim against the City suffers from some analytical confusion; it conflates several distinct strains of equal-protection doctrine. The court began by holding that strict scrutiny did not apply because female victims of domestic violence are not a "suspect class" for purposes of equal-protection analysis. The court then opted for rational-basis review, bypassing any form of intermediate scrutiny. The judge then took a detour into the caselaw that applies to claims of discrimination in public employment under the Equal Protection Clause, citing *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005), and *Salas v. Wisconsin Department of Corrections*, 493 F.3d 913, 926 (7th Cir. 2007), for the elements of a prima facie case under the burden-shifting approach borrowed from Title VII. Using this framework, the court held that because female domestic-violence victims are not a protected class, McCauley could not establish the first requirement of a prima facie case of discrimination. Finally, the court held that because the equal-protection claim was premised on Mersaides's group affiliation as a victim of domestic violence, the complaint did not state a claim for a "class of one" equal-protection violation. *See generally, Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing a "class of one" equal-protection claim); *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943-44 (7th Cir. 2009) (discussing the elements of a "class of one" claim).

This analysis is problematic for several reasons. For starters, analyzing the equal-protection claim under class-of-one doctrine was error. This is not a class-of-one case; McCauley has never contended that it is. Nor is the burden-shifting prima facie case methodology appropriate here. That formula has been used in employment-discrimination claims arising under the Equal Protection Clause or 42 U.S.C. § 1981 because equal-protection claims alleging discrimination in public employment can be analogized to claims under Title VII. Importing the prima facie case requirements from Title VII doctrine makes sense in the public-employment context, but that approach does not apply more broadly to all equal-protection cases. Finally, whether female domestic-violence victims are properly considered a "suspect" or "protected" class for equal-protection analysis is a merits question. The answer determines what level of judicial review applies to the defendant's actions, *see, e.g., Srail,* 588 F.3d at 943, a question not normally appropriate for resolution at the pleadings stage.[1]

---

[1] We note for completeness that McCauley makes alternative arguments on this point. He first argues that female victims of domestic violence ought to be recognized as a suspect class for equal-protection analysis, requiring strict scrutiny of the City's actions. He argues in the alternative that the claim should be treated as more generally alleging discrimination on the basis of gender, which calls for the application of intermediate scrutiny. *See United States v. Virginia,* 518 U.S. 515, 531 (1996).

Though the district court's analysis was faulty, the equal-protection claim against the City was properly dismissed. To state a *Monell* claim against the City for violation of Mersaides's right to equal protection, McCauley was required to "plead[] factual content that allows the court to draw the reasonable inference" that the City maintained a policy, custom, or practice of intentional discrimination against a class of persons to which Mersaides belonged. *See Iqbal*, 129 S. Ct. at 1949; *Monell,* 436 U.S. at 694; *Srail*, 588 F.3d at 943. He did not meet this burden.

In reviewing the sufficiency of a complaint under the plausibility standard announced in *Twombly* and *Iqbal*, we accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth. *Iqbal*, 129 S. Ct. at 1951. After excising the allegations not entitled to the presumption, we determine whether the remaining factual allegations "plausibly suggest an entitlement to relief." *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. That is, the complaint must contain "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief. *Id.* at 557. If the allegations give rise to an "obvious alternative explanation," *Iqbal,* 129 S. Ct. at 1951; *Twombly*, 550 U.S. at 567, then the complaint may "stop[] short of the line between possibility and plausibility of 'entitle[ment] to relief,'" *Twombly,* 550 U.S. at 557. Making the plausibility determination is "a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

We have interpreted *Twombly* and *Iqbal* to require the plaintiff to "provid[e] some specific facts" to support the legal claims asserted in the complaint. *Brooks*, 578 F.3d at 581. The degree of specificity required is not easily quantified, but "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The required level of factual specificity rises with the complexity of the claim. *Id.* at 405 ("A more complex case . . . will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected.").

*Brooks* and *Swanson* help illustrate the factual heft required to survive a motion to dismiss after *Twombly* and *Iqbal*. In *Brooks* the plaintiff was prosecuted for official misconduct and wire fraud relating to his duties as a Prison Review Board member. 578 F.3d at 578. He was acquitted on these charges and filed suit alleging a vast conspiracy by fellow board members, a state police officer, an IDOC employee, and the Illinois Attorney General based on their participation in or co-operation with the investigation against him. *Id.* The complaint alleged that the defendants "knowingly, inten-tionally[,] and maliciously prosecute[d]" him in retalia-tion for his exercise of constitutionally protected rights. *Id.* at 582. We held that this was "nothing more" than a "formulaic recitation of the cause of action," insufficient

to state a claim under *Twombly* and *Iqbal*. *Id.* The remaining allegations—primarily explaining each defendant's role in the investigation—were just as consistent with a lawful investigation as an illegal conspiracy to retaliate against Brooks. *Id.* at 581 ("The behavior Brooks has alleged that the defendants engaged in is just as consistent with lawful conduct as it is with wrongdoing."). Accordingly, we affirmed the dismissal of the complaint. *Id.* at 582.

In *Swanson*, on the other hand, we applied *Twombly/Iqbal* and held that the plaintiff's allegations were sufficient to survive a motion to dismiss on at least some of her claims. Swanson, an African-American loan applicant who was turned down for a loan, claimed that that the denial was based on her race in violation of the Fair Housing Act (among other causes of action). 614 F.3d at 402-03. Her complaint alleged that the defendants intentionally undervalued her home and that they did so because of her race. *Id.* at 403. She alleged that a third-party appraiser had valued the home at $240,000, much higher than the defendant's valuation of $170,000. *Id.* We held that because Swanson's claim of housing discrimination was uncomplicated, Swanson's pleading burden under *Twombly* and *Iqbal* was satisfied. *Id.* at 404. Her complaint contained factual allegations identifying (1) who discriminated against her; (2) the type of discrimination that occurred; and (3) when the discrimination took place. *Id.* at 405. We held that given the straightforward nature of the claim, *Twombly/Iqbal* required nothing more. *Id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)).

This case is more like *Brooks* than *Swanson.* Many of the alleged "facts" are actually legal conclusions or elements of the cause of action, which may be disregarded on a motion to dismiss. *See Iqbal*, 129 S. Ct. at 1951. For example, McCauley alleges that the City "has an unwritten custom, practice and policy to afford lesser protection or none at all to victims of domestic violence" and that "[t]here is no rational basis" for this purported policy. Similarly, McCauley alleged the following:

> [The City], through its agents, employees and/or servants, acting under color of law, at the level of official policy, practice, and custom, with deliberate, callous, and conscious indifference to McCauley's constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein detailed, and at all times material to this Complaint, [the City] had interrelated *de facto* policies, practices, and customs.

These are the legal elements of the various claims McCauley has asserted; they are not factual allegations and as such contribute nothing to the plausibility analysis under *Twombly/Iqbal*.

Once the legal conclusions are disregarded, just one paragraph of factual allegations remains:

> Defendant violated McCauley's constitutional rights under 42 U.S.C. § 1983 by:
>
>> a. failing to provide adequate security and promptly arrest Martinez;

b.  failing to promulgate any policy to ensure the prompt arrest of individuals guilty of violating protective orders;

c.  maintaining a policy or custom of failing to timely arrest violators of protective orders;

d.  maintaining a custom and practice of failing to adequately train officers concerning the necessity of promptly arresting individuals guilty of violating protective orders;

e.  maintaining a policy or custom of failing to have safeguards in place to ensure that violators of protective orders were timely arrested;

f.  failing to have a custom, practice and policy in effect to verify whether someone who is arrested for domestic violence is on parole;

g.  failing to have a custom, practice and policy to communicate with state officials and law enforcement officials regarding domestic violence arrests;

h.  failing to have a custom, practice and policy in effect in order to communicate with parole agents on domestic violence arrests;

i.  failing to have a custom, practice and policy in effect to verify whether an arrestee of a domestic violence offense is on parole prior to issuing an order of protection; and

j.  maintaining a custom, practice and policy of ignoring the seriousness of domestic violence arrests.

McCauley maintains that these allegations are sufficient to state a *Monell* equal-protection claim against the City. We disagree. In order to state a facially plausible equal-protection claim under *Monell*, the factual allegations in McCauley's complaint must allow us to draw the reasonable inference that the City established a policy or practice of intentionally discriminating against female victims of domestic violence in the provision of police protection. That is, McCauley needed to allege enough "by way of factual content to 'nudg[e]' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Iqbal,* 129 S. Ct. at 1952 (quoting *Twombly,* 550 U.S. at 570)).

Because the Equal Protection Clause is "concerned . . . with equal treatment rather than with establishing entitlements to some minimum of government services, [it] does not entitle a person to adequate, or indeed to any, police protection." *Hilton v. City of Wheeling,* 209 F.3d 1005, 1007 (7th Cir. 2000); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 196 (1989) (The government's failure to protect an individual from private violence is not actionable under the Due Process Clause.). "On the other hand, selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Hilton,* 209 F.3d at 1007. The allegations in the paragraph quoted above do not plausibly suggest that the City maintained a policy or practice of selective withdrawal of police protection. To the contrary, the complaint alleges that the City failed to have par-

ticularized practices in place for the *special* protection of domestic-violence victims. In essence, the complaint alleges that the City failed to promulgate specific policies for this particular class of crime victims, not that the City denied this class of victims *equal* protection. At most, the factual allegations in the complaint plausibly suggest the uneven allocation of limited police-protection services; they do not plausibly suggest that the City maintained an intentional policy or practice of *omitting* police protection from female domestic-violence victims as a class.

Just as in *Brooks*, McCauley's factual allegations are entirely consistent with lawful conduct—here a lawful allocation of limited police resources. 578 F.3d at 581. And the complexity of McCauley's equal-protection claim distinguishes this case from *Swanson*. The housing-discrimination claim at issue in *Swanson* was quite straightforward. Putting the defendants on notice of what it entailed was simple, so Swanson did not need to plead much by way of factual content in her complaint. There, in the absence of an obvious legal alternative explanation, pleading the "who, what, and when" of the discrimination claim was enough. *See Swanson*, 614 F.3d at 405. Here, McCauley's equal-protection claim is more complicated and counterintuitive. Yet he has alleged only that the City failed to have particularized safeguards in place for the special protection of domestic-violence victims. For the reasons we have explained, this does not state a *Monell* equal-protection claim against the City. This claim was properly dismissed.

**B. Predismissal Discovery Against Walker**

McCauley does not challenge the district court's order dismissing the official-capacity equal-protection claim against Walker on Eleventh Amendment grounds. Instead, he argues that the court should have allowed him to conduct limited discovery regarding Walker's personal involvement in the events leading to Mersaides's murder on the chance he might unearth a basis for a claim against Walker in his individual capacity. We review the denial of McCauley's discovery request for abuse of discretion. *Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008).

The district court's refusal to authorize Rule 12(b)(6) discovery was based largely on the court's view that any personal-capacity claim against Walker would suffer from the same deficiencies as the *Monell* claim against the City; namely, that Mersaides was not a member of a "suspect" or "protected" class for equal-protection purposes. For the reasons we have explained, this analysis is flawed. We nonetheless affirm on other grounds.

To determine whether pre-Rule 12(b)(6) discovery should have been available in this case, we need not decide the broader and more provocative question whether it should be available in general, in light of the *Twombly*/*Iqbal* pleading regime.[2] This is not a proper case

---

[2] Proposals for some form of "Rule 12(b)(6) discovery" have proliferated in academic circles in the wake of *Twombly* and *Iqbal*. *See, e.g.*, Arthur R. Miller, *From* Conley *to* Twombly *to*

(continued...)

for Rule 12(b)(6) discovery in any event. McCauley's counsel conceded at oral argument that he "has nothing" to suggest that Walker was personally involved in any of the events leading to Mersaides's death. Indeed, based on the complaint, there is no reason at all to think the IDOC director had any personal role in Martinez's parole supervision, much less the specific events preceding Mersaides's death. Accordingly, the denial of McCauley's request for Rule 12(b)(6) discovery was not an abuse of discretion.

AFFIRMED.

---

[2]  (...continued)

Iqbal: *A Double Play on the Federal Rules of Civil Procedure*, 60 DUKE L. J. 1, 105-10 (2010); Scott Dodson, *New Pleading, New Discovery*, 109 MICH. L. REV. 53 (2010); Edward A. Hartnett, *Taming* Twombly, *Even After* Iqbal, 158 U. PA. L. REV. 473 (2010). The theory underlying this effort is that the plausibility standard for surviving a motion to dismiss requires new tools to meet the higher bar, especially where the information necessary to survive a motion to dismiss is wholly or largely in the defendant's hands. *See* Miller, *supra*, at 105 ("Since the combined effect of *Twombly*, *Iqbal*, and the summary judgment trilogy is to require a plaintiff to have greater knowledge concerning his claim either before instituting an action or immediately thereafter, inequality of information access during those critical time frames poses a significant—if not the most significant—problem for many people seeking affirmative relief.").

HAMILTON, *Circuit Judge,* dissenting in part. I agree with my colleagues that plaintiff has failed to state a claim against defendant Walker. I respectfully dissent from the rejection of plaintiff's equal protection claim against the City of Chicago. I am skeptical about plaintiff's ability to prove the claim, but his complaint should be sufficient to survive a motion to dismiss for failure to state a claim, even under the new and subjective pleading standards announced in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). I explain first my skepticism, then some of the problems raised by *Iqbal*, and finally why the complaint should survive the motion to dismiss.

Mr. McCauley's suit seeks to enforce the Fourteenth Amendment's equal protection requirements on the decisions of a major city police force about how to allocate its resources. Plaintiff's only viable equal protection theory is that the Chicago police department made a deliberate decision to minimize the police protection available to victims of domestic violence, and that the police did so because of an intentional animus against women, who make up the vast majority of adult victims of domestic violence. See Bureau of Justice Statistics, U.S. Dept. of Justice, *Family Violence Statistics* 11 (2005), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/fvs.pdf (last visited Oct. 17, 2011) (finding that women were 84% of spouse abuse victims and 86% of victims of abuse at the hands of a boyfriend or girlfriend).

As I said, I am skeptical about the plaintiff's ability to prove such a claim. We require proof of intentional animus and do not hold municipalities liable for a mere

failure to arrest, no matter how tragic the consequences appear in hindsight. *E.g.*, *Hernandez v. City of Goshen*, 324 F.3d 535, 538 (7th Cir. 2003), following *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189 (1989). This approach avoids difficult questions that are all but unanswerable by courts in practice. To begin with, how should the police allocate their resources? And how should a federal court measure equality in the allocation of those resources? Should we focus on patrol officers on the beat per square mile? Per capita? Based on neighborhood crime rates? How should we gauge the seriousness of different crimes? Surely armed robberies deserve more attention than acts of vandalism, and attacks on vulnerable persons probably deserve more attention than bar fights.

A few moments of reflection could generate a list of many more variables and factors that a sensible citizen would want the police to consider in deciding how to allocate their resources for crime prevention. And no matter how a police department decides to allocate its resources, it will be possible to identify categories of crime victims who receive below-average attention from the police. There is no way to ensure complete equality, and the infinite variations in the ways to measure equality require any court considering the question to act with great caution.

And yet the courthouse door must remain open to claims that the police are systematically denying some people the literal equal protection of the law. The history of the Reconstruction after the Civil War reminds us that

state and local governments deliberately and systematically denied equal protection of the laws to former slaves and their descendants. More recently, the Jim Crow laws, internment of Japanese Americans, segregation, voting restrictions, gender discrimination, and harassment of Muslim Americans in the wake of the September 11, 2001 terrorist attacks all remind us that concerns about equal protection are not just matters of bygone history. A deliberate decision to withdraw or substantially reduce police protection to groups based on race, national origin, gender, religion, or political affiliation should qualify for federal court attention and remedies.

We and other federal courts have often recognized the legal viability of such claims, even if they are difficult to prove. See, *e.g.*, *Schroeder v. Hamilton School Dist.*, 282 F.3d 946, 957 (7th Cir. 2002) ("the core violation of the equal protection clause is indeed the selective withdrawal of police protection from a disfavored group") (Posner, J., concurring); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000), citing *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 70 (1872); *Elliot-Park v. Manglona*, 592 F.3d 1003, 1007-08 (9th Cir. 2010) (refusing to dismiss plaintiff's claim that officers' failure to investigate and arrest a drunk driver because of alleged racial favoritism violated equal protection); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113-14 (10th Cir. 2008) (affirming denial of qualified immunity where no rational basis was asserted for alleged policy of providing less protection to lesbian victims of domestic violence than to

heterosexual victims), citing *Watson v. City of Kansas City, Kansas*, 857 F.2d 690 (10th Cir. 1988); see also *Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 438-39 (2d Cir. 2009) (affirming summary judgment because plaintiff had not demonstrated the requisite disparate treatment of her domestic violence complaint); *Burella v. City of Philadelphia*, 501 F.3d 134, 148-49 (3d Cir. 2007).

As a claim that may seem improbable but not impossible, difficult to prove but not implausible, this case poses a test for federal civil pleading standards in the wake of *Ashcroft v. Iqbal*. In *Iqbal*, plaintiffs alleged that they had been mistreated by federal law enforcement officials because of their religion and their national origin in the wake of the September 11, 2001 terrorist attacks on the United States. The appeal concerned the plaintiffs' claims against the Attorney General of the United States and the Director of the Federal Bureau of Investigation. The Supreme Court recognized that the alleged actions of the federal law enforcement officials could have been perfectly legal so long as they were based on even-handed application of the law, but that mistreatment based deliberately on religion or national origin could violate the Constitution. 129 S. Ct. at 1952.

The Court held in *Iqbal* that the plaintiffs had failed to allege a plausible claim of religious or national origin discrimination against Attorney General Ashcroft and FBI Director Mueller. Although the plaintiffs had alleged discriminatory intent, the Court found that the complaint did not "contain any factual allegation suf-

ficient to plausibly suggest petitioners' discriminatory state of mind." *Id.* The Court wrote that determining whether a claim is plausible would "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. The method of analysis employed by the Court in *Iqbal* involved first "identifying the allegations in the complaint that are not entitled to the assumption of truth" because they are merely a "formulaic recitation of the elements" of the claim and thus "conclusory." *Id.* at 1951. The Court then looked only to the portions of the complaint it deemed to be "factual allegations" to make a subjective plausibility determination.

As a subordinate federal court, it is our responsibility to do our best to apply the law as stated in *Iqbal*. My colleagues do so here, and the *Iqbal* standard is clearly decisive for the panel majority. The problem here is that it also our responsibility to do our best to apply other Supreme Court decisions involving pleading standards, including *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993); *Erickson v. Pardus*, 551 U.S. 89 (2007); and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), as well as the Federal Rules of Civil Procedure as adopted by the Court and approved by Congress, and the form pleadings that are part of the Federal Rules of Civil Procedure and that were also approved by the Court and Congress. *Iqbal* is in serious tension with these other decisions, rules, and forms, and the Court's opinion fails to grapple with or resolve that tension. I do not believe it is an exaggera-

tion to say that these decisions, rules, and forms simply conflict with *Iqbal*.

As a result of this unresolved tension, since *Iqbal* was decided, the lower federal court decisions seeking to apply the new "plausibility" standard are wildly inconsistent with each other, and with the conflicting decisions of the Supreme Court. *Iqbal* has also generated a small blizzard of articles by law professors and practitioners critiquing the decision and analyzing its implications. One of the most useful and persuasive of those is Professor Arthur Miller's article, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L. J. 1 (2010). See also, *e.g.*, Robert Bone, *Plausibility Pleading Revisited and Revised: A Comment on Ashcroft v. Iqbal*, 85 Notre Dame L. Rev. 849 (2010); Patricia W. Hatamyar, *The Tao of Pleading: Do Twombly and Iqbal Matter Empirically?*, 59 Am. U. L. Rev. 553 (2010) (finding statistically significant differences in the treatment of motions to dismiss, particularly with regard to civil rights cases); Hon. Colleen McMahon, *The Law of Unintended Consequences: Shockwaves in the Lower Courts after Bell Atlantic v. Twombly*, 41 Suffolk U. L. Rev. 851 (2008).

Without revisiting the entirety of this lengthy critique, I note below some of the key problems that *Iqbal* presents for federal district and circuit judges, and the parties and attorneys who litigate cases before them:

First, *Iqbal*'s reasoning and holding conflict with Rule 9(b), which requires that a party alleging fraud or mistake "state with particularity the circumstances con-

stituting fraud or mistake." As for other states of mind, however, the rule provides: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In this context, "generally" means as a conclusion, without specifying underlying facts that would support the inference. For example, this provision has long been understood not to require that discriminatory intent be alleged with particularity in employment discrimination cases. See *Swierkiewicz*, 534 U.S. at 512 (unanimously rejecting requirement that employment discrimination complaint plead facts satisfying elements of prima facie case, because "imposing the Court of Appeals' heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2)").

Note that *Bell Atlantic Corp. v. Twombly* endorsed the continued vitality of *Swierkiewicz*. 550 U.S. 544, 569-70 (2007); see also Miller, 60 Duke L. J. at 31. *Iqbal* also seemed to endorse the key *Swierkiewicz* holding regarding heightened pleading standards, noting that Rule 9 "excuses a party from pleading discriminatory intent under an elevated pleading standard." 129 S. Ct. at 1954 (disclaiming a "rigid rule requiring the detailed pleading of a condition of mind" as "undesirable"). But in the analysis that was actually decisive in the case, however, the *Iqbal* Court held that under Rule 8 the complaint lacked "any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind." *Id.* at 1952. *Iqbal* does not elaborate on the nature and number of specific facts that must be included in the Rule 8 "short and plain statement of the claim" in

order to achieve plausibility. The Court's application of Rule 8 to impose a more demanding pleading standard for discriminatory intent is not consistent with its stated adherence to Rule 9 and its express authorization of general pleading of discriminatory intent and most other states of mind. The Court's statement about Rule 9(b) that "'generally' is a relative term" does not solve the problem or give practical guidance to district courts. See *id.* at 1954.

Second, *Iqbal* conflicts with other recent Supreme Court decisions. *Iqbal* did not overrule or question a number of the Court's prior cases on notice pleading. See *Leatherman*, 507 U.S. at 168 (unanimously rejecting heightened pleading standard for custom-or-policy claim under 42 U.S.C. § 1983); *Erickson*, 551 U.S. at 90 (after *Twombly*, summarily reversing dismissal of pro se prisoner's complaint for deliberate indifference to medical needs where the court of appeals deemed the complaint too "conclusory" with respect to whether defendant's actions caused "substantial harm," and finding that: "The holding departs in so stark a manner from the pleading standard mandated by the Federal Rules of Civil Procedure that we grant review."). Many cases, citing *Leatherman*, reject heightened pleading standards for the elements of a *Monell* custom or policy claim such as the one alleged here. See, *e.g.*, *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995) ("*Leatherman* makes clear that the federal courts are not to interpolate a requirement of fact pleading into the federal rules."). As noted, *Iqbal* also created tension with *Swierkiewicz* by endorsing its holding while simultaneously ap-

pearing to require the same sort of fact-specific pleading of discriminatory intent that the *Swierkiewicz* Court rejected.

Third, *Iqbal* conflicts with the form complaints approved by the Supreme Court and Congress as part of the Federal Rules of Civil Procedure. Rule 84 provides that the forms in the appendix "suffice under these rules and illustrate the simplicity and brevity that these rules contemplate." *Iqbal* did not purport to over-rule or amend Rule 84 or the forms, but it is difficult to reconcile the new "plausibility" standard with those forms. Many of the approved forms require virtually no explanation of the underlying facts as long as the defendant is informed of the event or transaction that gave rise to the claim, according to the broad notice purpose of the rules.

For example, Form 15 is a complaint for the conversion of property. It is sufficient for the plaintiff to allege that on a stated date at a stated place, "the defendant converted to the defendant's own use property owned by the plaintiff," and to identify the converted property and state its approximate value. Nothing more is needed — no factual details about the defendant's actions, and no allegation concerning the defendant's state of mind. Under the plausibility standard of *Iqbal*, this form complaint seems remarkably "conclusory," yet it is sufficient according to Rule 84.

Similarly, Form 11 is a complaint for negligence. Apart from jurisdiction and damages, it is sufficient for the complaint to say only that on a stated date at a stated

place, defendant "negligently drove a motor vehicle against the plaintiff." Again, nothing more is needed about just what the defendant did or why those actions amounted to negligence. This also seems quite "conclusory," but it is sufficient under Rule 84. But cf. *Branham v. Dolgencorp, Inc.*, 2009 WL 2604447, *2 (W.D. Va. Aug. 24, 2009) (applying *Iqbal* standard to dismiss slip-and-fall negligence complaint because it failed to allege "facts that show how the liquid came to be on the floor, whether the Defendant knew or should have known of the presence of the liquid, or how the Plaintiff's accident occurred").

Even Form 21, which includes a claim to set aside a fraudulent conveyance, is remarkably terse. That portion of the form complaint says only that on a stated date, the defendant conveyed all or a specified portion of defendant's real and personal property to another defendant "for the purpose of defrauding the plaintiff and hindering or delaying the collection of the debt." Again, nothing more is needed about the circumstances of the conveyance, and the "general" or "conclusory" allegation of a purpose to defraud is sufficient. One could go on with parallel analysis of the other form complaints.

Unless one can plausibly explain away the tension between *Iqbal* and Rule 9(b) and the Rule 84-endorsed form complaints, then *Iqbal* conflicts with the Rules Enabling Act, 28 U.S.C. § 2071 *et seq.*, and the prescribed process for amending the Federal Rules of Civil Procedure. See *Swierkiewicz*, 534 U.S. at 515, citing *Leatherman*, 507 U.S. at 168; *Hill v. McDonough*, 547 U.S. 573, 582 (2006)

("Specific pleading requirements are mandated by the Federal Rules of Civil Procedure, and not, as a general rule, through case-by-case determinations of the federal courts.").

Fourth, *Iqbal*'s reliance on the fact/conclusion dichotomy is highly subjective, and returns courts to the long disapproved methods of analysis under the regime of code pleading. See Miller, 60 Duke L. J. at 23-24. Is an allegation that "defendant was negligent" or that "defendant acted with racially discriminatory intent" an allegation of fact or a conclusion? Calling these assertions elements of the claim is not logically sufficient to determine when and if they should be denied a presumption of truth. Even in *Iqbal*, the Court presumed true some assertions that could be characterized as conclusory, while disapproving of others. See 129 S. Ct. at 1961 (Souter, J., dissenting). *Iqbal*'s reliance on the fact/conclusion dichotomy makes the difference indeterminate. Application of the dichotomy is leading to judge-specific and case-specific differences in outcome that confuse everyone involved. The long legal history of code pleading, though perhaps distant enough in time to have been largely forgotten by most of todays' lawyers and judges, provides ample additional evidence on this point.

Fifth, *Iqbal*'s reliance on "judicial experience and common sense" invites the highly subjective and inconsistent results that have been observed. The *Iqbal* concept of plausibility is "context-specific." 129 S. Ct. at 1950. As a practical matter, the concept invites district judges to exercise their individual views of the likely merits of

the case at the outset, when the only information available is the complaint. Worse still, an uncritical reading of the Court's "obvious alternative explanation" reasoning seems to invite judges to weigh competing explanations for alleged conduct and dismiss cases merely because they believe one explanation over another. See 129 S. Ct. at 1951 (referring to "more likely explanations"). In application, this standard bears a striking resemblance to the most stringent pleading requirement in American civil law, for pleading scienter in securities fraud claims, pursuant to the specific direction of Congress in the Private Securities Litigation Reform Act. See 15 U.S.C. § 78u-4(b)(2) (requiring plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); accord, *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 323-24 (2007) (explaining that a "strong inference" must be "cogent and compelling, thus strong in light of other explanations" for the defendant's actions).

Congress has not imposed such a demanding standard for pleading in any other context — including civil rights and employment discrimination cases, which often turn on whether a defendant's explanation for a decision is legitimate or merely a pretext covering for unlawful bias. Rule 9(b) and the Supreme Court decisions in *Swierkiewicz* and *Leatherman* permit plaintiffs to plead intent generally, meaning without the sort of specifics required under the PSLRA. But if the *Iqbal* pleading standard is applied in the district court, plaintiffs who already face the uphill battle of proving secret intent

must now contend with the possibility of pre-discovery dismissal whenever the alleged pretext asserted by defendants in their motion to dismiss sounds plausible to the common sense of the particular judge. The potential harm of *Iqbal* in this context is that outcomes will vary based on how different judges view the plausibility of, for example, a police policymaker harboring and acting on improper motives toward women who complain of domestic violence.

As we struggle with these problems, it is important to recall that the *Iqbal* Court disclaimed such a probabilistic balancing, absent access to evidence, to determine which theory of the case seems more likely true. See 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement' . . . ."). Although the *Iqbal* opinion used phrases such as "more likely," and "as between," it should not be read to say that a plaintiff should lose on the pleadings because a defendant had a more plausible alternative explanation. Rather, in light of the alternative explanation, plaintiff needed to "allege more by way of factual content to 'nudg[e]' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" 129 S. Ct. at 1952 (quoting *Twombly*, 550 U.S. at 570). A plausible claim can seem less plausible or probable than the obvious alternative and still survive dismissal. Whether this distinction involves a real difference will depend on the care judges take not to ratify potential false pretexts as "obvious" when making their common-sense plausibility determinations on bare pleadings.

For example, in this case, the majority relies on *Brooks*, in which we followed the reasoning in *Twombly* and said that the recited behavior was "just as consistent with lawful conduct as it is with wrongdoing." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). But this does not mean that we upheld the dismissal because a tie goes to the defendant. On its face, *Iqbal* leaves undisturbed the factual presumption in favor of plaintiff on a motion to dismiss. *Id.* Rather, the claims were dismissed because, absent more factual content, "Brooks's allegations are too vague to provide notice to defendants of the contours of his . . . claim." *Id.* at 581-82. The primary purpose of notice pleading under Rule 8 is notice. Implausible pleadings do harm primarily by failing to ground themselves sufficiently in reality such that defendants can know what is claimed.[1] Similarly, in *Swanson v. Citibank*, *N.A.*, 614 F.3d 400 (7th Cir. 2010), we

---

[1] Some commentators have noted a concern, underlying *Twombly* and *Iqbal*, with limiting defendants' supposed burden of complying with discovery. See Miller, 60 Duke L. J. at 53-59; Bone, 85 Notre Dame L. R. at 859. Others answer with competing concerns about providing plaintiffs with access to courts in order to discover the actual but often hidden explanation for defendants' harmful conduct. Given proper notice of the sort of claim being asserted, the Federal Rules of Civil Procedure give courts and parties powerful tools to confine the scope of discovery to relevant issues. See Fed. R. Civ. P. 26(b). I respectfully suggest that effective use of those tools is much more likely to control costs of litigation than the subjective and uncertain pleading standard of *Iqbal*, which has been multiplying litigation of pleading disputes.

reversed dismissal of a complaint that only alleged racial discrimination generally, mentioning just the perpetrator and time-frame. These allegations were enough to "give the opposing party notice of what the case is all about." *Id.* at 405.

The difference in result between *Brooks* and *Swanson* did not depend, in my view, on the existence of an obvious alternative explanation, which was present in both cases. See *id.* at 411 (Posner, J., dissenting in part). Nor is the *Monell* claim raised by McCauley here substantially more complicated than the discrimination alleged in *Swanson*. Rather, whether each of these complaints survives a Rule 12(b)(6) motion depends on a highly subjective plausibility determination. That determination must be made with great care, guided by an awareness of the core notice purpose behind Rule 8, as well as knowledge of the consequence of dismissing seemingly improbable, yet potentially meritorious, discrimination claims at such an early stage.

A simple thought experiment underscores the dangerous potential over-breadth of the *Iqbal* mode of parsing complaints — of first applying too aggressively the fact/conclusion dichotomy to a complaint, and then applying the "obvious alternative explanation" analysis to the facts that remain.

Imagine that as a federal district judge, you have read *Twombly* and *Iqbal* and now must act on a motion to dismiss an equal protection complaint in which the key paragraph reads:

> The educational opportunities provided by de-
> fendants for infant plaintiffs in the separate all-Negro
> schools are inferior to those provided for white
> school children similarly situated in violation of the
> equal protection clause of the Fourteenth Amendment
> to the Constitution of the United States. The respects
> in which these opportunities are inferior include
> the physical facilities, curricula, teaching, resources,
> student personnel services, access and all other ed-
> ucational factors, tangible and intangible, offered to
> school children in Topeka. Apart from all other
> factors, the racial segregation herein practiced in
> and of itself constitutes an inferiority in educational
> opportunity offered to Negroes, when compared
> to educational opportunity offered to whites.

Under the *Iqbal* approach, the first sentence merely
recites a legal conclusion regarding the elements of an
equal protection cause of action and thus should be
excluded from the *Iqbal* analysis. The third sentence is
similarly a bare conclusion that should also be ignored.
Only the middle sentence contains what might amount
to facts under *Iqbal*. A closer analysis, however, reveals
an arguably fatal lack of explanation regarding how the
listed items are inferior. The thrust of the sentence is a
bare conclusion that all factors, tangible and intangible,
contribute to the claimed deprivation. Does this complaint
provide the specific factual content required by *Iqbal*?

Even if the alleged "respects in which these oppor-
tunities are inferior" might properly be called allega-
tions of fact, it would be difficult for a claim of invidious

discrimination to seem plausible in light of the obvious alternative explanations for these deficiencies. School boards possess limited resources. Perhaps they simply allocated those resources according to neutral factors. Disparity in outcome is just as consistent with the natural effects of lower socio-economic status as it is with pernicious effects of racial segregation. Or so the post-*Iqbal* argument might go.

The paragraph quoted above is, of course, taken directly from plaintiffs' amended complaint in *Brown v. Board of Education*, filed on May 29, 1951. Amendment to Paragraph Eight of the Amended Complaint, *Brown v. Board of Education*, 98 F. Supp. 797 (D. Kan. 1951), available at http://www.clearinghouse.net/detail.php?id= 5479 (last visited Oct. 17, 2011). We also know that the conclusory allegation of the third sentence eventually appeared as the holding of the unanimous Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 495 (1954) ("Separate educational facilities are inherently unequal."). Under the standards of *Iqbal*, however, it would be easy to argue that the plaintiffs in *Brown* failed to state a plausible claim for relief that could survive dismissal. The Court's shift to "plausibility" pleading, and the assignment of inter-pretation of that standard to the subjective common-sense of individual judges, has markedly increased the danger of throwing out the proverbial baby with the bathwater.[2]

---

[2] See also Miller, 60 Duke L. J. at 127-30 (applying a similar hypothetical analysis to the complaint in the seminal notice

(continued...)

In the face of all these problems, what are the lower federal courts to do? These are all sources of controlling law that we are obliged to follow. Although careful analysis may help the lower federal courts determine, for example, that the *Iqbal* pleading standard would not require a different result in particular cases, there will be cases, and Mr. McCauley's equal protection claim appears to be one of them, where the standard makes a decisive difference.

The first thing we can do is recognize the uncertainty that litigants, their lawyers, and district courts now face. As a result of that uncertainty, the courts of appeals should insist that in all but the most unusual situations, a party whose pleading is dismissed based on the *Iqbal* plausibility standard should be entitled to an opportunity to amend the pleading after the court has made its decision. Allowing amendment after pleadings dismissals had long been our practice even before *Twombly* and *Iqbal*. See, *e.g.*, *Barry Aviation Inc. v. Land O' Lakes Municipal Airport Comm'n*, 377 F. 3d 682, 687 (7th Cir. 2004) (quoting 5A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed. 1990)). Whether one favors broader or narrower readings of *Twombly* and *Iqbal*, no one denies that the cases are being interpreted as having caused an upheaval in long-settled law. Attorneys and parties trying to draft complaints

---

[2] (...continued)
pleading case of *Dioguardi v. Durning*, 139 F.2d 774 (2d Cir. 1944)).

and other pleadings will be left wondering about many important questions and contradictions that the Court has not yet addressed. Rule 1 instructs us to construe the Federal Rules of Civil Procedure to secure the just, speedy, and inexpensive determination of cases. The Supreme Court has often reminded us that pleading rules should be applied to facilitate a proper decision on the merits rather than to impose a series of traps in which one mis-step can be decisive. *E.g.*, *Swierkiewicz*, 534 U.S. at 514 ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim."), quoted in *Christensen v. County of Boone*, 483 F.3d 454, 458-59 (7th Cir. 2007), and in *Brooks*, 578 F.3d at 580. We should exercise caution to avoid punishing parties for imperfect predictions as to how the subjective and inconsistent *Iqbal* standard might be applied in their case.

Some statistics show that generosity with regard to leave to amend appears to have increased under the new pleading regime, even as the total percentage of dismissal motions granted has risen. See Hatamyar, 59 Am. U. L. Rev. at 600 (analyzing statistics and finding a "noticeable increase in dismissals with leave to amend under *Twombly* and *Iqbal*"). District judges should continue to grant such leave when they are concerned with the effects on plaintiffs that I have discussed above. They should also grant leave when doing so could prevent results in otherwise similar cases from diverging based merely on differences in plausibility

determinations made by different judges according to their individual judicial experience and common sense.

Courts must freely give leave to amend under Rule 15(a) where interests of justice so require. Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 181-82 (1962). Under this liberal rule, we allow amendment on remand in many procedural dismissal cases, and certainly do so when relevant decisional law changed after the complaint was filed. See, *e.g.*, *Ienco v. City of Chicago*, 286 F.3d 994, 999 (7th Cir. 2002). When, as here, the changed decisional law involves the standard for pleading itself, interests of justice call for an opportunity to amend essentially as a matter of course unless it is clear that the opportunity would be futile. In *Iqbal* itself, the Supreme Court remanded to the Second Circuit for a determination whether to further remand — so that plaintiffs could seek leave to amend. 129 S. Ct. at 1954; see also *Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir. 2009) (remanding to district court for determination regarding leave to amend). We have continued to permit such amendment after *Twombly* and *Iqbal*. See, *e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). We should do so here.

But where that approach is not enough to resolve the case, I believe we must take care not to expand *Iqbal* too aggressively beyond its highly unusual context — allegations aimed at the nation's highest-ranking law enforcement officials based on their response to unprecedented terrorist attacks on the United States homeland — to cut off potentially viable claims. *Iqbal* exemplifies the old adage about hard cases. The failure

of the Supreme Court to address all of the law that would conflict with broad application of the case should weigh heavily against that broad application, at least until the Supreme Court provides clearer guidance about how to reconcile *Iqbal* with its prior cases, the Federal Rules of Civil Procedure, and their accompanying forms.

Reading the present complaint as a whole, plaintiff McCauley has alleged the particulars of a plausible *Monell* claim. As the majority points out, McCauley has alleged the elements of such a claim using the relevant legal language. While some of these statements are conclusory in nature, they serve to notify defendants and the court of the type of claim being brought. There can be no doubt that the complaint provides sufficient notice of the circumstances that gave rise to the claims. McCauley made factual allegations that Chicago police failed to arrest Martinez despite knowledge of his harassment and violations, ¶ 25, and that this failure resulted from a custom of untimeliness and indifference with regard to the seriousness of domestic violence, ¶ 125(c) and (j). McCauley alleges "deliberate indifference" generally, see ¶ 126, but elsewhere describes numerous specific failures to act that are factually consistent with such an intent. See, *e.g.*, ¶ 51. It is difficult to imagine what more McCauley might allege on the crucial question of intent without reciting a list of specific states of mind that Chicago police policymakers might have. We did not require such a recital in *Swanson* and we should not do so here.

By extending *Iqbal* to dismiss plaintiff McCauley's equal protection *Monell* claim against the City of Chicago,

the majority runs afoul of *Leatherman*, Rule 9(b), and the form complaints approved by the Supreme Court and Congress as part of the Federal Rules of Civil Procedure. Perhaps the Supreme Court majority intended *Iqbal* to work such a revolution in federal civil practice, but if so, the Court failed to grapple with the conflicts and did not express any direct rejection of these other governing sources of law. Under these circumstances, therefore, I would reverse the dismissal of plaintiff's equal protection claim against the City of Chicago and give him an opportunity to pursue discovery. Even if I agreed that the current version of the complaint failed to state a claim, I would remand with instructions to give plaintiff an opportunity to file an amended complaint to try to comply with the new and uncertain standards of *Iqbal*.